UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MYLES JACOB TUTTLE,<br><br>Defendant. | 5:17-CR-50049-JLV<br><br>REPORT AND RECOMMENDATION |

Pending are Defendant's Motion to Suppress Statements (Doc. 97) and Motion to Suppress Any Evidence of Lineup (Doc. 98). A hearing on the motions was held on Tuesday, May 22, 2018. Defendant was personally present and represented by his attorney of record, Terry Pechota. The Government was represented by the Assistant United States Attorney Kathryn Rich. Two witnesses testified at the hearing. Three exhibits were received into evidence. Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

**RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress Statements (Doc. 97) be denied. It is further recommended that Defendant's Motion to Suppress Any Evidence of Lineup (Doc. 98) be denied.

1

## JURISDICTION

Defendant is charged in a Superseding Indictment with First Degree Murder (Premeditated) and First Degree Murder (Felony Murder) in violation of 18 U.S.C. §§ 1111(a), 2, 1152, & 1153; Conspiracy to Commit Assault, in violation of 18 U.S.C. §§ 113(a)(3), 1152, 1153, & 371; and Accessory After the Fact to First Degree Murder, in violation of 18 U.S.C. § 3.  (Doc. 45).  The pending Motions were referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

### I.   The October 1, 2016 Interview

On the night of September 30, 2016, police stopped a vehicle outside of a Walmart in Lakewood, Colorado, containing three individuals.[1]  Law enforcement believed some of the vehicle occupants had information on a potential kidnapping out of South Dakota.  Approximately fifteen law enforcement officers from various agencies reported to the scene and removed the three occupants from the vehicle.  The individuals identified themselves as Tyler Shae Brewer, Orlando Guadalupe Villanueva, and Defendant Myles Tuttle.

Mr. Tuttle advised law enforcement he was willing to conduct an interview at the Lakewood police station, and consented to being transported in

---

[1]   No transcript was prepared.  The record was developed at the evidentiary hearing and is accessible through For The Record ("FTR"), Rapid City Courtroom 2, May 22, 2018, beginning at 9:00 a.m.

a police unit. Lakewood police handcuffed Mr. Tuttle per department policy and transported him to the station; his handcuffs were removed upon arrival. FBI Special Agent ("SA") Scott Eicher interviewed Mr. Tuttle at the Lakewood police station. SA Eicher testified at the May 22, 2018 evidentiary hearing, and the court finds his testimony credible.

The interview took place in a windowless room with enough space for three or four people to sit. (Ex. 2). Mr. Tuttle and SA Eicher were the only two persons present in the room during the interview. SA Eicher was in plain clothes, did not carry a firearm, and conducted the interview in a calm manner. He began by thanking Mr. Tuttle for coming to talk, and asked whether Mr. Tuttle understood the interview was voluntary and that he was not under arrest. Mr. Tuttle acknowledged that he understood. (Ex. 2 at 1:55). SA Eicher asked Mr. Tuttle about the two other passengers. Mr. Tuttle denied knowing them, and stated he simply gave them a ride from Rapid City, South Dakota the night before.

As the discussion about the other passengers continued, Mr. Tuttle declared he did not want to talk. (Id. at 5:15). SA Eicher responded that he would not get into any trouble; law enforcement was not investigating Mr. Tuttle, and SA Eicher just wanted to know the basics of what was going on. Mr. Tuttle replied by saying he did not want to incriminate himself. (Id. at 6:18). SA Eicher answered, "You're not going to incriminate yourself" and again said he just wanted to know how the vehicle got to Colorado. He continued: "You realize I'm with the FBI and this is serious . . . you won't

incriminate yourself if you just tell me the truth. Did you do something wrong?" Mr. Tuttle repeated "I don't know what's going on" and indicated he may be harboring fugitives. (Id. at 6:20–8:15).

After a few more minutes in this vein, SA Eicher told Mr. Tuttle he was "digging [himself] a hole" and that he had been told Mr. Tuttle would be cooperative. He told Mr. Tuttle was "not in trouble now," but he could be if he was lying. (Id. at 10:45). Mr. Tuttle again stated that he was not lying and he had no information. SA Eicher insinuated that if Mr. Tuttle did not cooperate now, South Dakota law enforcement agencies would charge him. (Id. at 10:45–11:30).

At this point, Mr. Tuttle asked for a lawyer. (Id. at 11:33). SA Eicher asked, "Are you saying you don't want to talk to me?" Mr. Tuttle said, "I just need to go home," to which SA Eicher responded "That might not be that easy." Mr. Tuttle stated, "I'm done talking," and SA Eicher asked, "You sure? This is your last chance." Mr. Tuttle remained silent. SA Eicher stood up, began gathering his documents, and asked one final time "You sure? This is your time. You can have a lawyer if you want but . . . I'm walking out." Mr. Tuttle said, "If you're going to charge me, charge me," and SA Eicher responded, "All right, I'll see what they want to do." (Id. at 13:00). SA Eicher then left and shut the door, leaving Mr. Tuttle alone in the interview room. The time stamp on the video read 1:23 a.m.; the interview lasted less than thirteen minutes.

Mr. Tuttle remained in the interview room for at least twenty-seven more minutes. The video terminated at minute marker 40:35, at which point

4

Mr. Tuttle still had not left the room. SA Eicher testified that during this break, he conferred with law enforcement and confirmed that Mr. Tuttle could be released. Mr. Tuttle was indeed released that night, and was not arrested.

## II.    The Photographic Series

On October 16, 2016, a group of individuals attempted to kidnap and then shot and killed Vinny Brewer in Pine Ridge, South Dakota. FBI Special Agent Jeff Youngblood participated in the murder investigation and testified at the evidentiary hearing. The court finds his testimony credible.

Law enforcement put together a photo series of fifteen individuals—ten men and five women—identified as persons of interests in both the Vinny Brewer murder investigation and the somewhat overlapping investigation into the murder of Annie Colhoff which had occurred several weeks before. (Ex. 1). Myles Tuttle's name was brought up as a person of interest in both murder investigations, and the FBI included his picture in the photo series. The photographs contained in the series were primarily drawn from driver's license databases. None of the individuals were depicted in jail stripes.

SA Youngblood and SA Chris Corwin met with Tiffanee Garnier on March 13, 2017. During her interview, Ms. Garnier said Mr. Tuttle was one of the drivers of one of the two vehicles involved in the Vinny Brewer murder, and that he had also gone to Denver with her after the Annie Colhoff murder. After Ms. Garnier provided law enforcement details regarding the Vinny Brewer murder and the Annie Colhoff murder, agents reviewed the photo series with her, and asked her to state if she recognized any of the individuals pictured.

5

They also asked her to state specifically if she did not recognize any of the individuals, and told her not to guess. The agents did not highlight Mr. Tuttle in any way. When the agents reached Mr. Tuttle's photograph, she identified him as the driver she had previously spoken about. Ms. Garnier indicated she either did or did not recognize the other individuals in the photo series.

SA Youngblood interviewed Veronica Richards and Emily Dubray on April 4, 2017. SA Youngblood had received a lead from Ivis Black Elk that Ms. Richards and Ms. Dubray had picked up Lisa Brewer and Myles Tuttle the night of Vinny Brewer's murder near White Clay, Nebraska. SA Youngblood showed them each photo in the series and asked them, like Ms. Garnier, to state if they recognized or did not recognize each of the individuals pictured. SA Youngblood did not highlight Mr. Tuttle's photo in any way. They both identified the photo of Mr. Tuttle as the male they picked up the night of the murder, although neither of them knew his name. They also indicated they did or did not recognize the others in the photo series.

## DISCUSSION

### I. The Motion to Suppress Statements

Mr. Tuttle requests that this court suppress all statements provided during his transport from the jail in Winner, South Dakota to the Pennington County Jail on March 28, 2017, as well as his October 1, 2016 interview in Colorado, because his Miranda rights were never provided. At the evidentiary hearing, the parties agreed that Mr. Tuttle made no statements on March 28, 2017. The court therefore will only address the October 1, 2016 interview.

6

Miranda warnings are required only when a suspect is subjected to custodial interrogation.  See Miranda v. Arizona, 384 U.S. 436, 467–68 (1966). "Interrogation in the Miranda context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" United States v. Briones, 390 F.3d 610, 612 (8th Cir. 2004) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  Here, the court will assume that Mr. Tuttle's questioning was an interrogation.  Specifically, the question "Did you do something wrong?" was reasonably likely to elicit an incriminating response.  The court instead will turn its attention to the dispositive issue in Mr. Tuttle's motion, to-wit: whether Mr. Tuttle was in custody during the interrogation.

To determine whether an interrogation occurs in custody, the court must inquire "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).  The test focuses on how a "reasonable person in the subject's situation would perceive his circumstances." Yarborough v. Alvarado, 541 U.S. 652, 662 (2004).  Moreover, the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).  Thus, "the only relevant inquiry" is whether a reasonable person in Mr. Tuttle's position "would have felt at liberty to end the

7

interrogation and leave." United States v. Brave Heart, 397 F.3d 1035, 1038–39 (8th Cir. 2005).

In United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990), the Eighth Circuit identified six factors to consider in determining whether an individual is in custody for the purposes of Miranda:

> (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

Id. "These factors are not exclusive; custody 'cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly.'" United States v. Elzahabi, 557 F.3d 879, 883 (8th Cir. 2009) (quoting United States v. Czichray, 378 F.3d 822, 827–28 (8th Cir. 2004)). The "most obvious and effective means of demonstrating that a suspect has not been taken into custody" is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary. Brave Heart, 397 F.3d at 1039 (quoting Griffin, 922 F.2d at 1349). "[N]o governing precedent of the Supreme Court or this court has yet held that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." United States v. Henry, 3:15-CR-30119-RAL, 2016 WL 3339238, at *5 (D.S.D. June 13, 2016) (quoting Brave Heart, 397 F.3d at 1039).

The Eighth Circuit's Brave Heart decision controls this case. There, the defendant voluntarily submitted to an interview with an FBI agent and a tribal

8

officer regarding his nephew's death. 397 F.3d at 1036. The interview took place in a large conference room at the tribal police station, and the defendant was not restrained in any way. Id. At the outset, the agent advised the defendant he was not under arrest, that they did not intend to arrest him, and that the interview was voluntary and the defendant could leave at any time. Id. at 1037. The officers questioned the defendant for an hour without reciting Miranda warnings, and then took a ten-minute break, leaving the defendant in the conference room alone. Id.

When the officers returned, they "adopted a more accusatory tone," telling the defendant that the evidence clearly showed he was responsible for his nephew's death. Id. The defendant became visibly upset, confessed to killing his nephew, and voluntarily made an eleven-minute taped confession. Id. at 1037–38. The entire interview lasted almost two hours; following the confession, the officers again left the room without telling the defendant he could leave, returned twenty minutes later, and arrested the defendant. Id. at 1038. At no point was the defendant read his Miranda rights. The Eighth Circuit reversed the district court and held that the defendant was not in custody for purposes of Miranda, placing great emphasis on the fact that the officers stated at the outset that the interview was voluntary and terminable at any time. Id. at 1039–40.

The circumstances of this interview are less indicative of a custody finding than those present in Brave Heart. The first three mitigating factors discussed in Griffin are present here. Mr. Tuttle voluntarily agreed to speak

9

with law enforcement at the station, and consented to being transported to the station in a marked police car. Although Mr. Tuttle was placed in handcuffs in the police car, those handcuffs were removed when he arrived at the station, and Mr. Tuttle was not restrained in any way during the interview. Finally, and most significantly, SA Eicher expressly advised Mr. Tuttle at the beginning of the interview that he was not under arrest and his participation in the interview was voluntary; Mr. Tuttle stated he understood and agreed. See Henry, 2016 WL 3339238, at *5 (discussing Griffin and Brave Heart).

    The final three Griffin factors, which weigh in favor of custody, are insignificant here. Although SA Eicher told Mr. Tuttle multiple times he would not get in trouble if he "told the truth," and asked Mr. Tuttle if he had done "something wrong," his tactics were far less accusatory and intimidating than those employed in Brave Heart. See 397 F.3d at 1036. Neither was the environment police-dominated: although the interview room was small, SA Eicher was the only law enforcement officer present, and he did not display his weapon. Like in Brave Heart, SA Eicher did not inform Mr. Tuttle that he was free to leave at the end of the interview, and left Mr. Tuttle in the room for at least twenty-seven minutes after terminating questioning. However, Mr. Tuttle was not arrested at the end of the interview. Also noteworthy is the brevity of the interview—approximately thirteen minutes—and the fact that Mr. Tuttle did in fact voluntarily terminate the interview by stating he no longer wished to talk and he wanted an attorney.

Based on all these circumstances, the court finds a reasonable person in Mr. Tuttle's position "would have felt at liberty to end the interrogation and leave." Brave Heart, 397 F.3d at 1038–39. Therefore, Mr. Tuttle was not in custody for the purposes of Miranda, and SA Eicher was not required to administer Miranda warnings. The court recommends the Motion to Suppress Statements be denied.

## II.   The Motion to Suppress Any Evidence of Lineup

Mr. Tuttle asks the court to suppress any evidence at trial of any "in-person, photographic, voice or other pretrial identification" placing Mr. Tuttle at the scene of Vinny Brewer's murder. Law enforcement did not conduct any in-person lineup or voice identification procedure; however, the court will discuss the photographic series that SA Youngblood showed Tiffanee Garnier, Veronica Richards, and Emily Dubray.

The Eighth Circuit employs a two-step analysis to determine whether an identification is unreliable. Schawitsch v. Burt, 491 F.3d 798, 803 (8th Cir. 2007). First, the defendant must establish that the photographic arrays shown to the witness were "impermissibly suggestive." Id. Second, if the photographic arrays were "impermissibly suggestive," then the court inquires "whether under the totality of the circumstances of the case, the suggestive confrontation created a substantial risk of misidentification at trial." Id. "Pared to its essence, the second inquiry is whether the identification is reliable." Graham v. Solem, 728 F.2d 1533, 1541 (8th Cir. 1984). "It is the

11

likelihood of misidentification which violates a defendant's right to due process[.]" Neil v. Biggers, 409 U.S. 188, 381–82 (1972).

The defendant must show that the police acted improperly in order to show a due process violation resulting in exclusion. Perry v. New Hampshire, 565 U.S. 228, 242 (2012) ("A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place."). A procedure is not impermissibly suggestive when the officers utilize a photo series and do not suggest that the defendant is the person in a particular picture or suggest that the defendant engaged in wrongdoing. See United States v. Omar, 786 F.3d 1104, 1108–1109 (8th Cir. 2015) (finding photo series not impermissibly suggestive); cf. United States v. Patterson, 20 F.3d 801, 805–06 (8th Cir. 1994) (finding procedure impermissibly suggestive where police showed eyewitnesses a single photograph of the suspect).

The facts of this case are similar to United States v. Omar. There, FBI agents showed witnesses a series of photographs, rather than a photo array. After showing each photograph, the agents asked if the witness knew the person in the picture. Omar, 786 F.3d at 1108. The Eighth Circuit held that "[t]his identification procedure did not imply that the suspect was the person in the picture. Nor did it impermissibly suggest that [the defendant] had engaged in wrongdoing. [The defendant's] picture was simply one in a series of photographs about which the witnesses were asked a non-suggestive question."

12

Id. at 1108–09.  "Such an identification procedure is not impermissibly suggestive."  Id.

Similarly, here law enforcement showed Tiffanee Garnier, Veronica Richards, and Emily Dubray a photo series of twelve to fifteen men and women, with no additional identifying information.  SA Youngblood asked the interviewees if they recognized anyone in the photos.  No indication was made that any one individual was a suspect, and SA Youngblood did not highlight Mr. Tuttle's photograph in any way.  The procedure did not "impermissibly suggest that [Mr. Tuttle] had engaged in wrongdoing."  Omar, 786 F.3d at 1108.  Because the procedure was not impermissibly suggestive, the court need not reach the second prong of the Schawitsch analysis.  Law enforcement did not act improperly by showing the photo series.  Therefore, no due process violation occurred, and the Motion to Suppress Any Evidence of Lineup should be denied.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress Statements (Doc. 97) be denied.  It is further recommended that the Motion to Suppress Any Evidence of Lineup (Doc. 98) be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 27th day of August, 2018.

BY THE COURT:

*[signature]*

DANETA WOLLMANN
United States Magistrate Judge