UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>  vs.<br><br>MYLES TUTTLE,<br><br>                Defendant. | CR. 17-50049-01-JLV<br><br>ORDER |

**INTRODUCTION**

Defendant filed a motion to suppress statements and a motion to suppress any evidence generated through a lineup. (Dockets 97 & 98). The motions were referred to Magistrate Judge Daneta Wollmann for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order dated March 9, 2015. The magistrate judge conducted a hearing on the motions and issued a report and recommendation ("R&R") concluding defendant's motions should be denied. (Docket 232). Defendant timely filed objections to the R&R.[1] (Docket 240). For the reasons stated below, defendant's objections are overruled and the report and recommendation is adopted consistent with this order.

---

[1]The court entered an order finding defendant's objections should be allowed even though they were "filed outside the time established by [28 U.S.C.] § 638(b)(1)." (Docket 246).

**DEFENDANT'S OBJECTIONS**

Mr. Tuttle's objections to the R&R are summarized as follows:

1. Defendant was in custody and should have been advised of his Miranda[2] rights before being interviewed; and

2. The photographic lineup was unduly suggestive.

(Docket 240).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. See also Fed. R. Crim. P. 59(b)(3). The court completed a *de novo* review of those portions of the R&R to which objections were filed.

**ANALYSIS**

A grand jury indicted Mr. Tuttle on one count of premeditated first degree murder in violation of 18 U.S.C. §§ 1111(a), 2, 1152 and 1153; one count of felony murder in violation of 18 U.S.C. §§ 1111(a), 2, 1152 and 1153; one count of conspiracy to commit assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3); and one count of accessory after the fact to first degree murder in violation of 18 U.S.C. § 3. (Docket 129). Three other individuals were indicted with Mr. Tuttle on some of the same counts and other counts of

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

the superseding indictment relating to the death of Vincent Brewer III on October 16, 2016, at Pine Ridge, South Dakota.  Id.

Mr. Tuttle filed a motion to suppress two statements purportedly given to law enforcement.[3]  (Docket 97).  He also filed a motion to suppress any identification of him which occurred during a series of photographic lineups. (Docket 98).

The magistrate judge conducted a suppression hearing at which FBI Special Agents Scott Eicher and Jeff Youngblood testified and three exhibits were admitted.  (Dockets 191 & 232).  Relying on the audio recording of the hearing, For The Record ("FTR"), the magistrate judge issued the R&R. (Docket 232 at p. 2 n.1).[4]

1. DEFENDANT WAS IN CUSTODY AND SHOULD HAVE BEEN ADVISED OF HIS MIRANDA RIGHTS BEFORE BEING INTERVIEWED

The magistrate judge found "Mr. Tuttle was not in custody [on October 1, 2016,] for purposes of Miranda, and SA Eicher was not required to administer Miranda warnings."  Id. at p. 11.  Based on this finding, the

---

[3] During the suppression hearing the parties agreed Mr. Tuttle did not give any statement on March 28, 2017, while being transferred from the jail at Winner, South Dakota, to the Pennington County Jail at Rapid City, South Dakota.  (Docket 232 at p. 6).  Because of that agreement, the magistrate judge only addressed the interview given by Mr. Tuttle on October 1, 2016.  Id.

[4] The report indicates no transcript of the suppression hearing was prepared.  (Docket 232 at p. 2 n.1).  This statement is in error as the transcript of the suppression hearing was filed before the issuance of the R&R. See Docket 191.  The court will cite to the transcript and not to the FTR referenced by the magistrate judge.

3

report recommends defendant's "[m]otion to [s]uppress [s]tatements be denied." Id.

Mr. Tuttle objects to the report's recommendation. (Docket 240 at pp. 1-2). Defendant argues the recommendation is erroneous and claims the facts presented at the suppression hearing were materially different from the facts found by the magistrate judge. Id. at p. 1. Defendant believes the facts material to the court's *de novo* review of the evidence presented include the following:

1. [D]efendant was taken into custody at the Walmart Parking Lot where the vehicle in which he was a passenger was surrounded by more than 10 police cars transporting police officers and agents in uniform and with sidearms.

2. [D]efendant was asked, after the police officers and police vehicles surrounded the car in which he was a passenger, whether he would talk to the police.

3. [H]e was taken to the Lakewood police department in handcuffs with an armed police officer and put in a small room with no windows and one door.

4. [H]e was then interrogated by an agent.

5. [T]here were two different agents physically present not only one as the Magistrate determined although they may have been present at different times.

Id. Mr. Tuttle argues "[u]nder the circumstances of this case, as testified to by Agent Eicher and the contents of the videotape played at the hearing, there can be no question that Myles Tuttle was in custody and should have been advised of his [Miranda] rights prior to interrogation." Id. at pp. 1-2. Defendant contends the recommendation of the magistrate judge should be

rejected and the court should find Mr. Tuttle's October 1, 2016, "statements should be suppressed." Id. at p. 2. The court will resolve defendant's objections in the following development of the material facts.

On October 1, 2016, SA Scott Eicher with the Colorado FBI was coordinating a kidnapping investigation with the Lakewood, Colorado, Police Department. (Docket 191 at p. 24:1-2). The alleged kidnapping victim was Shay Brewer. Id. at p. 24:6-7. In order to control the scene at the Lakewood Walmart where the vehicle in question was located there were three marked police cars and four or five unmarked police cars. Id. at p. 21:5-11. There were approximately 15 special agents and police officers at the scene. Id. at p. 21:12-15. The Lakewood Police vehicles conducted the initial intervention with the suspect vehicle and officers spoke with the occupants. Id. at p. 8:1-7. The occupants were identified as Tyler Schae[5] Brewer, Orlando Villaneua and Mr. Tuttle. Id. at p. 8:11-21. The intervention occurred around midnight. Id. at p. 17:21-22.

SA Eicher arrived at the scene a couple of minutes later. Id. at p. 8:8. He spoke with Task Force Officer Mike Thrapp who had talked with Mr. Tuttle at the scene. Id. at p. 9:5-6. Officer Thrapp indicated Mr. Tuttle was willing to speak with law enforcement at the Lakewood Police Department. Id. at

---

[5]The transcript refers to Ms. Brewer as "Tyler Shay Brewer." (Docket 191 at p. 8:14-15). Ms. Brewer's middle name is spelled "Schae." See United States v. Tyler Schae Brewer, CR. 16-502124 (D.S.D. 2016).

p. 9:6-8.  Mr. Tuttle consented to being transported to the police department in a marked unit.  Id. at p. 9:12-16.  Pursuant to police department policy, Mr. Tuttle was handcuffed for officer safety.  Id. at p. 9:17-24.  SA Eicher followed the patrol car containing Mr. Tuttle for the approximate 20-minute trip from Walmart to the police station.  Id. at p. 18:8-10.

At the Lakewood Police Department Mr. Tuttle was placed in an interview room.  Id. at p. 10:1-7.  The room contained a table and two chairs with video recording.  Id. at p.10:7-11.  SA Eicher estimated the windowless room was 5′ by 10′ in size.  Id. at p. 25:17-20.  According to the video recording, Mr. Tuttle was placed in the room at 1:00:30.  Exhibit 2.

Approximately ten minutes later SA Eicher entered the room.  Id. at 1:10:00.  At about that same time a uniformed officer entered the room, conducted a wand scan of Mr. Tuttle's body and removed the handcuffs.  Id.; see also Docket 191 at p. 11:15-17.  The uniformed officer left the room approximately forty seconds later.  Exhibit 2 at 1:10:40.  SA Eicher, who was plain clothed, did not have a sidearm or other weapon with him in the interview room during his time with Mr. Tuttle.  (Docket 191 at pp. 11:24-12:4; see also Exhibit 2).  The door remained unlocked throughout the course of the interview.  (Docket 191 at p. 14:6-11).  SA Eicher testified that at no time did Mr. Tuttle request to leave the room.  Id. at p. 29: 17-18.

SA Eicher began the interview by telling Mr. Tuttle he was not under arrest.  Exhibit 2 at 1:11:00-10.  The agent stated he understood Mr. Tuttle

6

came voluntarily to the police department. Id. at 1:11:10-30. Mr. Tuttle gave an inaudible answer, which did not prompt further questions by the agent about his understanding of Mr. Tuttle's cooperation and consent to an interview. Id.

SA Eicher testified "the objective at the police station was to interview Mr. Tuttle about his knowledge of the passengers that were with him and how they got from Rapid City to Denver." (Docket 191 at p. 12:13-16). The discussion between SA Eicher and Mr. Tuttle was about the circumstances of Mr. Tuttle bringing the other two individuals to Denver and was in a conversational tone. Exhibit 2 at 1:11:30-1:15:30. About twelve minutes into the conversation the agent asked Mr. Tuttle to tell the truth and the agent told him he was not trying to get him in trouble. Id. 1:15:30-1:17:20. Mr. Tuttle indicated he did not really know the other individuals, but they had given him gas money to bring them to Denver. Id. at 1:1:17:20-1:18-10. When Mr. Tuttle indicated the car was not his but a friend's, SA Eicher told him "you're digging yourself a hole . . . put yourself in my place—you're not in trouble . . . the South Dakota authorities, they don't want to charge you." Id. at 1:1:19:10-1:21:00. At that point Mr. Tuttle indicated he wanted a lawyer. Id. at 1:21:00. The agent asked him "you don't want to talk?" and Mr. Tuttle answered "I just need to get home." Id. at 1:21:00-1:21:40. SA Eicher interjected "last chance, you're sure . . . . You're sure—you can have a lawyer if you want one." 1:22:00-1:22:10. Mr. Tuttle replied "charge me if you're going

7

to." Id. at 1:22:30. The agent left the room. Id. at 1:22:40. Mr. Tuttle remained in the room for approximately thirty minutes longer. See Exhibit 2 at 1:22:40-1:45:07; see also Docket 191 at p. 15:23-25. SA Eicher escorted Mr. Tuttle out of the room and walked him to the door of the Lakewood Police Department, where he was "free to go." (Docket 191 at pp. 15:25-16:3). SA Eicher testified that at no time off-camera was anyone aggressive or threatening to Mr. Tuttle and no promises were ever conveyed to him. Id. at p. 13:15-23.

The magistrate judge properly identified the law applicable to a custodial interrogation. (Docket 232 at pp. 7-8). The magistrate judge specifically addressed the six factors considered by the United States Court of Appeals for the Eighth Circuit for determining if an individual is in custody.

> (1) whether the suspect was informed that he . . . was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

Id. at p. 8 (citing United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). The magistrate judge identified the most telling of these factors. "The 'most obvious and effective means of demonstrating that a suspect has not been taken into custody' is an express advisement that the suspect is not under arrest and that his participation in questioning is voluntary." Id. (citing

8

United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005) (quoting Griffin, 922 F.2d at 1349).

The magistrate judge noted at the end of the "approximately thirteen minute" interview, "Mr. Tuttle did in fact voluntarily terminate the interview by stating he no longer wished to talk and he wanted an attorney." Id. at p. 10. The magistrate judge found "a reasonable person in Mr. Tuttle's position 'would have felt at liberty to end the interrogation and leave.' " Id. at p. 11 (citing Brave Heart, 397 F.3d at 1038-39).

The court overrules Mr. Tuttle's factual objections. The court finds Mr. Tuttle was not in custody and was not subject to a custodial interrogation. Defendant's motion to suppress the statement is denied.

2.  THE PHOTOGRAPHIC LINEUP WAS UNDULY SUGGESTIVE

The magistrate judge found the series of photographs used by FBI Special Agent Jeff Youngblood during his interviews of Tiffanee Garnier, Veronica Richards and Emily Dubray was not unduly suggestive. (Docket 232 at p. 13). Finding that "no due process violation occurred," the magistrate judge recommended defendant's "[m]otion to [s]uppress [a]ny [e]vidence of [l]ineup should be denied." Id.

Mr. Tuttle objects to the report and recommendation. (Docket 240 at p. 2). He argues the way Mr. Tuttle's photograph was presented to the three individuals was "unduly suggestive." Id. Defendant does not challenge the findings of the magistrate judge and challenges only the conclusion that no due

9

process violation occurred by the identification process employed by SA Youngblood. Mr. Tuttle asks the court to reject the report and recommendation and suppress the identifications developed by SA Youngblood. Id.

A summary of the facts developed at the suppression hearing is necessary to analyze defendant's objection. On October 16, 2016, following a botched kidnapping of Vincent Brewer, III, a group of individuals shot and killed him. (Docket 232 at p. 5). Law enforcement developed a series of photographs ("photo series") of several individuals—nine men and five women—who had been identified as people of interest in the murder of Mr. Brewer and the investigation into the murder of Annie Colhoff which had occurred several weeks earlier.[6] Suppression Hearing Exhibit 1. The FBI included a photograph of Mr. Tuttle in the 14 photographs.[7] (Docket 232 at p. 5; see Exhibit 1 at p. 3.

During an interview conducted by SA Youngblood and another FBI Special Agent, Ms. Garnier stated Mr. Tuttle had been a driver of one of the vehicles in the Brewer murder and that after the Colhoff murder he went with her to Denver. Id. Near the end of the interview the agents reviewed the

---

[6]The report mistakenly identified the photo series as containing ten men and five women. (Docket 232 at p. 5).

[7]Mr. Tuttle's photograph was number three in the photo series. (Docket 191 at p. 49:13-14).

10

photo series with Ms. Garnier. SA Youngblood testified they showed her "most of these. I think we showed 13 photos to Tiffanee minus her own photograph. So she would have viewed 12 of these photographs."[8] (Docket 191 at p. 41:2-4). Ms. Garnier's photograph was number ten in the photo series. Id. at p. 50:15.

According to SA Youngblood, Ms. Garnier told the agents she met Mr. Tuttle through a common friend after the Colhoff murder. Id. at p. 70:19-20. Ms. Garnier was looking for a ride "after Annie Colhoff's murder to get back to Denver to get out of this area. . . . She was driven back to Denver by Myles and his sister in the vehicle that [law enforcement] recovered after Vinny's murder." Id. at pp. 70:15-17 and 71:6-8.

SA Youngblood testified he and the other agent "asked her to take a look at the photographs and just let us know if she knew any of these individuals, if she could identify them." Id. at p. 43:15-17. SA Youngblood did not highlight Mr. Tuttle's photograph in any way. Id. at p. 43: 18-20. The agent testified the interview was not to specifically "target Myles Tuttle. . . . Myles Tuttle was not the intent of these interviews." Id. at pp. 54:10-11 and 55:3-4. While proceeding through the photo series, Ms. Garnier identified Mr. Tuttle by name

---

[8]It is not clear in the record which other photograph was not included in the photo series to arrive at the twelve photographs shown to Ms. Garnier. SA Youngblood testified one of the later photographs in Exhibit 1 had not yet been added to the photo series at the time of the Garnier interview because that individual was not yet a "possible persons [sic] of interest." (Docket 191 at p. 41:10-14).

11

as the individual "she'd seen after Annie Colhoff's murder and the day of Vinny Brewer's murder because he was the driver." Id. at p. 44:5-11.

A few weeks later SA Youngblood interviewed Veronica Richards and Emily Dubray. Id. at p. 44:12-19. They were interviewed together at their home in Pine Ridge, South Dakota. Id. at p. 44:20-45:1. The agent did not know why he "interviewed them together, other than that they're a couple." Id. at p. 45:4-6. Ms. Richards and Ms. Dubray told SA Youngblood they had been together near White Clay, Nebraska, on the night of the Brewer murder when they picked up Lisa Brewer and "a skinny, Indian male with dark hair . . . walking with Lisa carrying a bag that looked like a girl's bag." Id. at pp. 45:6-8 and 46:3-5. After picking up Lisa Brewer and the "skinny, Indian male" the women drove them to a residence approximately three miles away. Id. at pp. 68:18-69:3. During the short drive, the women spoke with Lisa Brewer and not the man. Id. at p. 69:13-14.

SA Youngblood instructed the two witnesses to look at the photo series and "either you know them or you don't. . . . didn't want them to guess. Did not want them to feed off of each other. . . . if Emily knew one and Veronica didn't that was fine." Id. When they got to Mr. Tuttle's photograph "[b]oth immediately recognized "him as a skinny, Indian male with dark hair that was walking with Lisa carrying a bag that looked like a girl's bag." Id. at p. 46:3-5. While neither of them knew his name, both "knew his face. . . . They only knew him by sight." Id. at p. 46:9-11.

12

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). "In considering such a claim," the court must "initially analyze whether the pre-trial identification procedure was suggestive and unnecessary." United States v. Omar, 786 F.3d 1104, 1108 (8th Cir. 2015). If the procedure was suggestive, the court must then "examine whether the identification technique created a 'substantial likelihood of misidentification.' " Id. (citing Perry v. New Hampshire, 565 U.S. 228, 239 (2012) (internal citation omitted).

The magistrate judge compared the photo series method employed by SA Youngblood with the procedure used by law enforcement in Omar. (Docket 232 at p. 12). Without going through the step-by-step similarities described by the magistrate judge, the court adopts the comparison developed in the report. The "identification procedure" employed by SA Youngblood with all three witnesses "did not imply that [Mr. Tuttle] was the person in the picture. Nor did it impermissibly suggest that [Mr. Tuttle] had engaged in wrongdoing. [Mr. Tuttle's] picture was simply one in a series of photographs about which the witnesses were asked a non-suggestive question. Such an identification procedure is not impermissibly suggestive." Id. (citing Omar, 796 F.3d at 1108-09).

Mr. Tuttle's second objection to the R&R is overruled.

**ORDER**

Based on the above analysis, it is

ORDERED that defendant's objections (Docket 240) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 232) is adopted consistent with this order.

IT IS FURTHER ORDERED that defendant's motions to suppress (Dockets 97 & 98) are denied.

Dated December 6, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE